# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-19-00865-CV

---

### Alberto Romero, Appellant

### v.

### Silvia Isela Gonzalez, Appellee

---

### FROM THE 126TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-10-006730, THE HONORABLE JAN SOIFER, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Seven years after a default divorce decree dissolved the marriage of Silvia Isela Gonzalez and Alberto Romero and divided their property, Gonzalez filed a petition to enforce the divorce decree, alleging that Romero violated the decree by failing to deliver the marital home to her. Romero pleaded laches as an affirmative defense to bar enforcement. After an evidentiary hearing, the trial court concluded that laches did not apply and granted the petition. For the following reasons, we affirm.

## BACKGROUND

In 1998, before meeting Gonzalez, Romero bought the home. He later met Gonzalez, she moved in, and they married in 2001. During their marriage, they jointly refinanced the home in May 2002 and again in February 2004 with a $68,060 principal amount and $548.22 monthly payments for principal and interest.

In December 2010, Gonzalez, acting pro se, filed for divorce. In February 2011, she secured a default divorce decree awarding her the home. The divorce decree listed the home property as "Community Property" and stated that "**The Wife owns alone**, as her separate property, the property listed below"; "**The Court takes away** and divests any interest, title, and claim the Husband may have to the property listed below"; and "**The Court orders** the Husband to sign deeds needed to transfer any property listed below to the Wife." Banking statements for the month following the divorce show a $43,399.14 principal amount remaining on the mortgage. Romero testified that he was not served with the petition for divorce and did not learn of the divorce proceedings or default divorce until later that year.

Around four months after obtaining the divorce, Gonzalez moved out of the home after the locks were changed, explaining that Romero "didn't want me to live there anymore" and "was always, you know, trying to kick me out in a very aggressive way, and there was not much to talk anymore" and that "[t]here was a lot of violence, and we knew that we had to leave the house." Romero testified that around that same time, Gonzalez would "come and yell at me in my house" saying that the "house was hers and that she was going to take it away from me." Romero testified that after she "yelled" that "she was going to take [the] house," he came to the court to see the final divorce decree and was "surprised that it said that the house was awarded to Ms. Gonzalez." He explained that he decided to "let it go" because he "didn't have the money to hire an attorney" and "in spite of her, you know, bad manners at me."

Romero remained in the home and continued to pay the mortgage until it was paid off in April 2019. Romero also testified that he rented out three rooms of the house at $350 month each during some of the time after Gonzalez moved out to live with her family.

After she moved out, Gonzalez did not live in the house at any time before the issuance of the enforcement order.

In 2018, Gonzalez filed a petition for enforcement of property division, requesting that the trial court order Romero to surrender the home. At this point, Romero hired an attorney and answered, pleading laches as an affirmative defense and asserting that the default judgment erroneously awarded Romero's separate property home to Gonzalez because it was mischaracterized as community property in Gonzalez's petition for divorce. At a June 2019 evidentiary hearing on Gonzalez's petition for enforcement of the property division, both Romero and Gonzalez testified. Romero testified that he had recently lost his job and had nowhere else to go if he could not stay at the home. Romero also testified that he had been arrested for domestic violence in the past but explained that the incident occurred "[b]ecause I pulled [Gonzalez's] purse because she had my insurance for my car, and I needed to get it from her." Gonzalez testified that after the final decree of divorce was granted, she did not talk to Romero because "[y]ou cannot talk to him":

> Because we were there with him for four years, and we were – and he had us – the children and me in a room in a little bed. And he will go and kick the door and break the door at 3:00 o'clock in the morning or 5:00 screaming and yelling and kicking the door. And my son, the oldest, was very affected for it.

She also testified that she was afraid to approach Romero and is still afraid of him now. In closing argument, Gonzalez's counsel argued:

> [Y]ou heard testimony from my client. She was visibly shock when she had to live with him. It was very difficult for her even to talk about those issues today. We did not got into the details because of how emotional she gets into what she lived there and why she would not even approach Mr. Romero after all these years for the divorce. . . . My client testified today that she can't even talk to Mr. Romero. He basically has been abusive before and is still abusive to her. There is

3

no evidence today that she unreasonable delayed the assertion of her claim. You heard testimony from him that she before told him that – he testified that she told him, "That's – that's my property." He just came to the court, get – grab a copy of the decree and set it aside. So my client had to come to the court and seek the authority and the power of this court to enforce the divorce decree.

(Errors in original.) In response, Romero's counsel argued, "I don't think that a fair and equitable outcome of what we've heard today is have an old man without a job turned out of his house in 30 days with nowhere to go and just simply out of the money he paid on the mortgage when he could've been anywhere else investing in a house."

After the hearing, the trial court granted Gonzalez's petition for enforcement. The enforcement order adjudged Romero in contempt for violating the divorce decree and ordered Romero to deliver the property and sign the deeds needed to transfer the property to Gonzalez. Romero requested findings of fact and conclusions of law. The trial court found that Romero "learned of the Final Decree six months after the divorce became final and unappealable and failed to take any further legal action" and that Gonzalez's "delay was not unreasonable under the circumstances and the payments made by [Romero] on the property in the interim do not constitute a detrimental change in [Romero's] position" and concluded that "[l]aches does not bar enforcement of the Divorce Decree." Romero appeals from the enforcement order, raising two issues: (1) "Laches is a valid equitable defense against the enforcement of a divorce decree's division of property," and (2) "the trial court abused its discretion by failing to apply laches against [Gonzalez]'s enforcement of a seven-year-old divorce decree to acquire Mr. Romero's separate property home."[1]

---

[1] Although Romero characterizes the property home as his "separate property home" and alleges that "he lost what should have rightly remained his separate property home," he does not

4

## DISCUSSION

Divorce decrees are final judgments "distinguishable from other final judgments only by the remedies available for their enforcement." *O'Carolan v. Hopper*, 414 S.W.3d 288, 301 (Tex. App.—Austin 2013, no pet.) (citing *Huff v. Huff*, 648 S.W.2d 286, 287 (Tex. 1983)). Providing for suits to enforce divorce decrees, *see generally* Tex. Fam. Code §§ 9.001–.014, "[t]he Texas Legislature confers upon the trial court wide discretion in the enforcement of property divisions subsequent to a decree of divorce," *Dade v. Dade*, No. 01-05-00912-CV, 2007 WL 1153053, at *1 (Tex. App.—Houston [1st Dist.] Apr. 19, 2007, no pet.) (mem. op.). Specifically, "the court may render further orders to enforce the division of property made or approved in the decree of divorce . . . to assist in the implementation of or to clarify the prior order," Tex. Fam. Code § 9.006(a); however, "[a] court may not amend, modify, alter, or change the division of property made or approved in the decree of divorce," *id.* § 9.007(a).

We review a trial court's order on a motion for enforcement of a final divorce decree for abuse of discretion.[2] *See Hargrove v. Hargrove*, No. 03-15-00415-CV, 2016 WL 1039019, at *1 (Tex. App.—Austin Mar. 9, 2016, no pet.) (mem. op.). A trial court abuses its discretion when it acts unreasonably, arbitrarily, or without reference to guiding rules or principles. *Id.* Under the abuse of discretion standard, sufficiency of the evidence is not an

---

explain how the characterization of the property as community property in the divorce decree before being awarded to Gonzalez is at issue in this appeal from the enforcement order.

[2] When all parties who may be affected by the enforcement action have been properly served, "the proceedings shall be as in civil cases generally," Tex. Fam. Code § 9.001(c), which our sister courts have interpreted as providing the right to appeal from a final enforcement order, *see Vats v. Vats*, No. 01-12-00255-CV, 2012 WL 2108672, at *1 n.1 (Tex. App.—Houston [1st Dist.] June 7, 2012, no pet.) (mem. op.) (collecting authorities). It is not disputed that the enforcement order in this case is a final and appealable order, and the order includes a Mother Hubbard clause stating that "[a]ll relief requested and not expressly granted is denied."

independent ground of error but is a relevant factor in assessing whether the trial court abused its discretion. *Id.* When, as here, findings of fact and conclusions of law are entered for a post-divorce enforcement order, "[a] trial court's findings are reviewable for sufficiency of the evidence under the same standards that are applied in reviewing evidence supporting a jury's answer." *Beshears v. Beshears*, 423 S.W.3d 493, 499 (Tex. App.—Dallas 2014, no pet.).

Romero first argues that "[t]he [Texas] Family Code does not expressly set nor disclaim a statute of limitations for enforcing the real property division in a divorce decree, and when statutes are silent, the defense of laches is available as an equitable remedy," citing federal case law. *See, e.g.*, *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954, 961 (2017) (noting that "'principal application' of laches 'was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation'" (quoting *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 (2014))). Romero notes that although the Texas Family Code "sets a two-year deadline to enforce division of tangible personal property," *see* Tex. Fam. Code § 9.003(a) (setting deadline for suits to enforce division of "tangible personal property"); *cf. id.* § 9.003(b) (setting deadline for suits to enforce division of "future property not in existence at the time of the original decree"), it "is silent on real property," *see id.* § 9.002 (providing that "court that rendered the decree of divorce . . . retains the power to enforce the property division" but not imposing time limitation for real property); *see also Matter of Marriage of Wyly*, 934 S.W.2d 175, 177 (Tex. App.—Amarillo 1996, writ denied) (noting respondent could not rely on statutory predecessor to section 9.003(a) to bar petitioner's motion to enforce because property at issue is real property, not "tangible personal property").

6

As we have noted, however, before the legislature enacted section 9.003's time limits, "courts had held that motions to enforce property division . . . were governed by the supreme court's decision in *Huff*" and that "[i]n *Huff*, the supreme court held that the ten-year dormancy period governing the enforcement and revival of judgments applied." *O'Carolan*, 414 S.W.3d at 288 (citing *Ex parte Goad*, 690 S.W.2d 894, 896 (Tex. 1985) (explaining that motions to enforce division of future property were governed by holding in *Huff* before legislature enacted two-year filing period and applying ten-year period mandated by *Huff* because suit to enforce was filed before enactment of two-year period)); *see* Tex. Civ. Prac. & Rem. Code § 34.001(a) ("If a writ of execution is not issued within 10 years after the rendition of a judgment . . . the judgment is dormant and execution may not be issued on the judgment unless it is revived."). In *Ex parte Goad*, the Texas Supreme Court described this period as a "ten-year statute of limitations." 690 S.W.2d at 896; *see Abrams v. Salinas*, 467 S.W.3d 606, 611 (Tex. App.—San Antonio 2015, no pet.) (collecting authorities regarding 10-year limitation period applying to actions to enforce divorce decree judgments); *cf. Pettitt v. Pettitt*, 704 S.W.2d 921, 923–24 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (applying *Huff* and holding that motion to enforce divorce decree to divide separate property was action to enforce judgment and thus ten-year period applied).

"As a general rule, laches will not bar a plaintiff's suit before the statute of limitations has run absent 'extraordinary circumstances' that would work a 'grave injustice.'" *Fox v. O'Leary*, No. 03-11-00270-CV, 2012 WL 2979053, at *3 (Tex. App.—Austin July 10, 2012, pet. denied) (mem. op.) (quoting *Caldwell v. Barnes*, 975 S.W.2d 535, 538 (Tex. 1989)). Here, Gonzalez filed her petition to enforce the divorce decree within the relevant ten-year period, and

7

Romero neither describes nor presents evidence of "extraordinary circumstances" that would work a "grave injustice."

Nevertheless, even if we consider the essential elements of laches rather than whether "extraordinary circumstances" would work a "grave injustice," we still conclude that the trial court did not abuse its discretion in concluding that laches did not bar the enforcement of the divorce decree. The two essential elements of laches are "(1) unreasonable delay by one having legal or equitable rights in asserting them; and (2) a good faith change of position by another to his detriment because of the delay." *Caldwell*, 975 S.W.2d at 538 (quoting *Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 80 (Tex. 1989)). As the party asserting laches, Romero bore the burden of proving the elements. *See Ebner v. First State Bank of Smithville*, 27 S.W.3d 287, 306 (Tex. App.—Austin 2000, pet. denied).

As to the second element,[3] Romero did not explain to the trial court or on appeal how he *changed* his position because of the alleged delay. From 2011 to 2018, Romero continued doing what he had been doing—living in the house and paying the mortgage. He argues that enforcement of the decree will "mean he spent seven years in Austin's rapidly booming housing market paying off a home loan then losing the market-driven equity increase when he could have begun investing in a new home years earlier." But Romero did not provide testimony or present other evidence that he would have invested in a new home "years earlier" had Gonzalez sought to enforce the divorce decree earlier or that there was a "market-driven

---

[3] As to the first element, Romero argues that Gonzalez "testified she experienced fear while living with Mr. Romero, but offered no explanation why she waited seven years after leaving the home to enforce the divorce decree." Although we do not rest our decision on the "unreasonable delay" element, we note that at the hearing Gonzalez testified that she was afraid to approach Romero and is still afraid of him now, not just when she was living with him.

8

equity increase." And even if Romero had changed his position because of the alleged unreasonable delay, he did not present evidence of how any such change would be in good faith when Romero conceded that after Gonzalez "yelled" that "she was going to take [the] house," he read the final divorce decree in 2011 and saw that it awarded the house to Gonzalez. *Cf. Fox*, 2012 WL 2979053, at *5 ("Rather, O'Leary's lack of diligence in familiarizing himself with the deed restrictions, of which he was aware no later than December 2009, and his continuation of the project when expressly told by his neighbor that he was in violation of them, conclusively establishes that he did not act in good faith."); *Green v. Parrack*, 974 S.W.2d 200, 204 (Tex. App.—San Antonio 1998, no pet.) (concluding appellee failed to satisfy burden of proof to establish laches because appellee "was aware, by virtue of the take-nothing judgment entered against her in the previous litigation, that she had no right of ownership in the eight inch strip of land, much less in almost fourteen additional inches of the [appellants'] property" and therefore "cannot demonstrate that she made a good faith change in her position in reliance on the Greens' failure to complain about the location of the fence at the time it was constructed"). Finally, Romero fails to establish that the trial court abused its discretion in concluding that the alleged change of position was not detrimental. Although Romero alleges on appeal that he suffered "heavy financial loss," the evidence did not conclusively establish financial losses when Romero maintained possession of the residence, which had value as a place to live, and rented three rooms of the house for "[f]ive or six months" in a given year at $350 a month each.[4]

---

[4] Consistent with his testimony at the hearing, Romero stated in a Proposed Support Decision and Information that Romero filed with the trial court: "Mr. Romero rents out three rooms in his home. When they are occupied, they each fetch $350/month. If all three were occupied through the year they would earn $12,600, but they are not consistently occupied – we estimate they typically earn him **$10,500** a year."

## CONCLUSION

For these reasons, we overrule Romero's issues on appeal and affirm the trial court's enforcement order.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Kelly, and Smith

Affirmed

Filed:   November 10, 2021